## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHARLES FRANKLIN**                                  **CIVIL ACTION**

**VERSUS**                                            **NO. 20-01013**

**DARRYL VANNOY**                                     **SECTION: "D"(1)**


### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

### I.  State Court Factual and Procedural Background

Petitioner, Charles Franklin, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On April 23, 2010, Franklin was charged by a bill of indictment with three counts of first degree murder in violation of La. Rev. Stat. § 14.30.[1]  After a trial, a jury

---

[1] State Rec., Vol. 1 of 17 , Bill of Indictment dated April 23, 2010.  Co-defendant Dwayne Johnson was also charged.

found petitioner guilty as charged.[2]  On January 8, 2015, the trial court sentenced petitioner to life imprisonment without the benefit of probation or suspension of sentence.[3]

On August 24, 2016, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence.[4]  Petitioner filed a writ application with the Louisiana Supreme Court which denied relief on September 6, 2017.[5]

Franklin filed an application for post-conviction relief on November 7, 2018.[6]  On May 20, 2019, the state district court denied relief.[7]  Petitioner's related writ application to the Louisiana Fourth Circuit was denied on June 21, 2019.[8]  The Louisiana Supreme Court denied his related writ application on March 16, 2020.[9]

On March 19, 2020, Franklin filed the instant federal application seeking habeas corpus relief in which he asserts the following claims for relief[10]: (1) the state trial court's denial of a challenge for cause was a denial of due process and his appellate counsel was ineffective for failing to raise the issue on appeal; (2) ineffective assistance of counsel for failing to (a) call certain witnesses; (b) impeach witnesses; and (c) object and move for a mistrial based on the state's improper comments.

---

[2] State Rec., Vol. 1 of 17, minute entry dated November 3, 2014; minute entry dated November 5, 2014; minute entry dated November 6, 2014; minute entry dated November 7, 2014; minute entry dated November 8, 2014; State Rec., Vol. 10 of 17, trial transcript November 8, 2014; State Rec., Vol. 11 of 17, trial transcript (con't) of November 3, 5-8, 2014; State Rec., Vol. 12 of 17, trial transcript (con't) of November 3, 5-8, 2014; State Rec., Vol. 13 of 17, voir dire and closing argument transcript of November 3, 5-8, 2014.
[3] State Rec., Vol. 1 of 17, minute entry dated January 8, 2015; State Rec., Vol. 12 of 17, sentencing transcript of January 8, 2015.
[4] State v. Franklin, 198 So.3d 1222 (La. App. 4th Cir. 2016); State Rec., Vol. 1 of 17.
[5] State v. Franklin, 224 So.3d 982 (La. 2017); State Rec., Vol. 17 of 17.
[6] State Rec., Vol. 15 of 17, Uniform Application for Post-Conviction Relief dated November 7, 2018.
[7] State Rec., Vol. 15 of 17, Ruling on Post-Conviction Application of May 20, 2019.
[8] State Rec., Vol. 15 of 17, La. 4th Cir. Order, 2019-K-0496, dated June 21, 2019; 4th Cir. Writ Application, 2019-K-0496, dated June 5, 2019.
[9] State v. Franklin, 294 So.3d 1048 (La. 2020).
[10] Rec. Doc. 4.

On December 8, 2020, the state filed its response.[11]  The state concedes that petitioner's application is timely and that his claims are exhausted.  The state contends that petitioner's claims are meritless.  Franklin filed a traverse reiterating his claims.[12]

## I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state courts' decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state courts' decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[11] Rec. Doc. 14.
[12] Rec. Doc. 16.

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the " 'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell,

535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has

explained:

> A state court decision is contrary to clearly established precedent if the state
> court applies a rule that contradicts the governing law set forth in the
> [United States] Supreme Court's cases. A state-court decision will also be
> contrary to clearly established precedent if the state court confronts a set of
> facts that are materially indistinguishable from a decision of the [United
> States] Supreme Court and nevertheless arrives at a result different from
> [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has

held: "[A] state-court decision is an unreasonable application of our clearly established precedent

if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a

particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1705 (2014).  However, the

Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court
> unreasonably applies this Court's precedent; it does not require state courts to
> extend that precedent or license federal courts to treat the failure to do so as error.
> Thus, if a habeas court must extend a rationale before it can apply to the facts at
> hand, then by definition the rationale was not clearly established at the time of the
> state-court decision.    AEDPA's carefully constructed framework would be
> undermined if habeas courts introduced rules not clearly established under the guise
> of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases

give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot

be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van

<u>Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Harrington v. Richter</u>, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); <u>see also</u> <u>Renico v. Lett</u>, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  <u>White</u>, 134 S. Ct. at 1701.

<h2 style="text-align:center">II. Facts</h2>

On direct appeal, the Louisiana Fourth Circuit summarized the facts of this case as follows:

> NOPD Sgt. Michael Rooney testified that shortly before midnight on January 7, 2010, he and Officer Terry Thomas were dispatched to an aggravated burglary in the 2700 block of Urquhart Street.  He arrived at 2721 Urquhart Street, where he noticed that the door to the residence was open. Sgt. Rooney entered and observed a female lying on the floor in a pool of blood, and another female lying at the head of a bed.  Both were deceased. Sgt. Rooney observed a wounded third female (Ms. Belisle) lying perpendicular on the bed.  The wounded female was unable to communicate.  Sgt. Rooney then discovered a young child, who was unharmed, moving under the bed covers.  Other police units arrived and discovered a deceased male victim in the rear yard.

> Former NOPD Homicide Detective Harold Weishan testified that he was dispatched to the scene.  He indicated that the female victims were located in the first bedroom of the residence.  Ballistics evidence retrieved from the scene included numerous spent shell casings fired by a rifle and others cast off by a hand gun.

> Detective David Harris of the FBI Violent Crime Task Force was assigned the task of documenting the rear yard, where he encountered the male victim lying face down in the grass with a gunshot wound to the head.  Det. Harris also participated in canvasing the neighborhood for witnesses and assisted in the execution of a search warrant for 2710 Urquhart Street, located across the street from the crime scene.  A pair of boots, tennis shoes, a black/red sweatshirt, and a black long sleeve T-shirt were recovered in that search.

> Det. Timothy Bender, the primary detective on the case, assisted in canvassing the area for witnesses, which produced information that the people living across the street knew who was responsible for the shootings.  Det. Bender and other officers spoke to Brittany Walker and Crystal Smith, who resided at 2710 Urquhart Street. Arnold Wilson, Mallene "Twin" Dilbert, and Johnny Perry were also present in the residence.  No one in the home wanted to speak with the officers.  However, Ms. Walker and Ms. Smith whispered to Det. Bender that they had information, but could not speak in front of Mr. Wilson and Ms. Dilbert.  Det. Bender accompanied Ms. Walker and Ms. Smith to the homicide office to take their statements. The women identified photographs of Charles "Tiger" Franklin and Dwayne "Red" as the shooters.  They were acquainted with both men.

Det. Bender returned to the residence the next morning with Ms. Smith and Ms. Walker. At that time, Ms. Walker gave Det. Bender a black plastic container with empty holes and two live rounds of 380 caliber bullets, which she retrieved from a closet. Looking over the crime scene on the morning after the shooting, Det. Bender, along with Detective Winston Harbin, discovered a spent 380 casing in the yard near where Mr. Harris' body was found.

On January 10, 2010, Det. Bender interviewed Ms. Belisle at University Hospital. She related the events as she remembered them. On January 11, 2010, Det. Bender obtained arrest warrants for Mr. Franklin and Mr. Johnson.[1]

[1] Mr. Johnson turned himself in with his attorney.

Det. Bender obtained a search warrant for Mr. Franklin's residence at 2361 N. Villere Street. Mr. Franklin was arrested by the SWAT team at his residence. A search of the residence produced a cell phone hidden in the toilet and a dark colored shirt later identified as belonging to Mr. Perry. A day later, officers returned to N. Villere Street and searched the exterior of the houses in close proximity to Mr. Franklin's residence. Specifically, a search was made around 2359 N. Villere Street, a house that bordered Mr. Franklin's residence with no fence between the properties. Behind a pillar at the rear of that house, officers discovered a bag containing numerous rounds of AK 47 assault rifle ammunition.

Forensic pathologist, Dr. Paul McGarrity, testified he autopsied the victims' bodies. His findings during his January 8, 2010 autopsy of Mr. Harris' body indicated that he suffered two fatal .38 caliber gunshot wounds to the head, delivered at close range. Those bullets were retrieved during the autopsy. Ms. Matthews' body sustained ten gunshot wounds. Judging by the small entry and large exit wounds to Ms. Matthews' body, Dr. McGarrity opined she was shot by an automatic weapon. The autopsy of Ms. Harris' body revealed nineteen gunshot wounds. Dr. McGarrity retrieved two bullets from Ms. Harris' body, determining that she had been shot by a rifle.

Now retired NOPD firearms examiner Sgt. Byron Winbush examined twenty pieces of ammunition related to this case—fifteen spent AK–47 rifle casings, four spent bullets and one copper jacket bullet. Sgt. Winbush also examined two rifle bullets retrieved during the autopsy of Ms. Harris' body and concluded both bullets were fired by the same weapon. Sgt. Winbush's examination of the two 380 caliber bullets retrieved during the autopsy of Mr. Harris' body caused him to conclude that the bullets were fired by the same handgun. As for the fifteen AK–47 cartridge casings recovered from the shooting scene, Sgt. Winbush noted that all the casings were fired by the same weapon. In conclusion, Sgt. Winbush indicated that one AK–47 rifle and one 380 caliber gun were used in these shootings.

Ms. Belisle, the fourth shooting victim, testified that she, Mr. Harris, Ms. Harris, and Ms. Matthews, were living at 2721 Urquhart Street on January 7, 2010. Ms. Harris sold drugs (crack, she believed) to make ends meet. They were home

on the night of the shooting, along with Ms. Matthews and Ms. Harris's two year-old godchild. About 11:30 p.m., Ms. Matthews, Ms. Harris, and the child were asleep in one bedroom. Ms. Belisle was in another room, when she heard someone knocking at the back door. Ms. Belisle opened the door and saw only shadows, so she slammed and locked the door. She was frightened and told Mr. Harris, who exited the front door, leaving it unlocked. He walked through the alley to the rear yard. Ms. Belisle returned to her bedroom. As she watched television, she felt someone standing over her. The person had a hoodie on with a scarf over his face and a small black or silver gun pointed in her face. She screamed, waking Ms. Harris and Ms. Mathews. At that time, Ms. Matthews screamed because a second person armed with a rifle, or "long gun" entered the house. Both assailants were dressed in black with their faces covered. They demanded money and drugs from the three women. Ms. Matthews gave the man something, but it was not enough. The assailant with the rifle instructed the other assailant, who had a red complexion, to go outside and "do what was planned." Approximately ten seconds later, Ms. Belisle heard gunshots outside and assumed that Mr. Harris had been shot. The assailant with the red complexion came back into the house and stood next to Ms. Matthews, as the assailant with the rifle began to count. When he reached the number ten, he shot Ms. Matthews. Ms. Belisle testified that when the assailants began shooting, she hid under the covers and played dead. She was shot in the leg. The shooters ran from the house. Ms. Belisle screamed for help and called 911. She was unable to give a description of the assailants.

While in the hospital, Ms. Belisle gave Det. Bender a description of the shooters. Specifically, she stated that one had a red complexion and was smaller; the other one was taller and had a darker black complexion. At trial, Ms. Belisle testified that the man with the long gun was not wearing gloves. This contradicted her statement to Det. Bender, three days after the shootings.

Ms. Walker testified that in January 2010, she was living at 2710 Urquhart Street with Ms. Smith and Mr. Perry. On occasion, Mr. Franklin, Mr. Johnson and some of their friends would stay at the residence. Ms. Smith had a relationship with both Mr. Franklin and Mr. Perry. She said that some of the people who hung out at her house had guns—an AK–47 and a 380. She took a picture of Ms. Smith and Mr. Johnson posing at the house with an AK–47 rifle. On another occasion, Ms. Walker said she saw Mr. Franklin with an AK–47 and Mr. Johnson with the smaller gun, the 380. She knew that Mr. Franklin and Mr. Johnson sold drugs.

Ms. Walker stated that sometime prior to the shooting, two of the female victims got into an argument with Mr. Franklin over the sale of crack cocaine. One of the females accused Mr. Franklin of stealing from their house. After that incident, Mr. Franklin and Mr. Johnson often watched the victims' house because the women told people that they got drugs from Mr. Franklin and were stealing his clientele.

Ms. Walker recalled that on the day of the shooting, she was at home with her daughter, Ms. Smith, Mr. Franklin, Mr. Johnson, and Mr. Wilson.  She stated that Mr. Franklin and Mr. Johnson had their weapons (the AK–47 and the 380) with them at her house. After Mr. Perry came home from work later that afternoon, Mr. Franklin and Mr. Johnson left the house, each wearing some of Mr. Perry's black clothing, including gloves and shoes.  They were armed with the AK–47 and the 380 weapon.  Mr. Franklin left some of his shoes at the residence.  Mr. Wilson, who was also present at the time, left around the same time as Mr. Franklin and Mr. Johnson.  Within five minutes of the men leaving, Ms. Walker heard five or six gunshots.  Mr. Wilson returned to Ms. Smith's residence shortly after the shootings, Mr. Franklin and Mr. Johnson did not return.

Ms. Walker testified that after the police arrived on the scene, Ms. Smith spoke with Mr. Franklin on the telephone.  He was asking Ms. Smith to tell him who was in the area, what was going on, and if they had seen anything.  Ms. Walker and Ms. Smith were handcuffed and taken to headquarters.  They gave a statement to police and identified pictures of Mr. Franklin and Mr. Johnson and described the two men's previous altercation with the victims.

Ms. Walker further stated that shortly after the shootings, Ms. Dilbert, Mr. Franklin's girlfriend, came to the house asking to borrow sugar.  Neither Ms. Walker nor Ms. Smith had ever met Ms. Dilbert before. Ms. Dilbert spoke first to Mr. Wilson, and the two passed a cell phone back and forth between one another as they spoke to Mr. Franklin on the other end of the line.

Mr. Perry testified that he moved in with Ms. Smith and Ms. Walker in January 2010.  Mr. Perry knew Mr. Franklin and Mr. Johnson from their frequent visits with Ms. Walker and Ms. Smith.  He recounted that prior to the shooting, Mr. Franklin and Mr. Johnson had a minor verbal altercation with two of the women across the street about some drug transactions.  The four of them were involved in dealing drugs on the street.  Mr. Perry recalled giving a statement to Det. Bender in which he said he heard Mr. Johnson say he was going to the kill Mr. Harris.

On the day of the shootings, Mr. Perry returned from work about 6:30 p.m. and found Mr. Franklin, Mr. Johnson and Mr. Wilson visiting with Ms. Walker and Ms. Smith.  Mr. Perry noticed that Mr. Franklin and Mr. Johnson were wearing his black clothing, shoes and work gloves, but he made no mention of it at the time. He also recalled that Mr. Franklin had a skull cap, designed to be worn over his face.  He noted that the two men were armed with an SK (Chinese chopper/rifle) and a 380 weapon.  Mr. Perry went to bed between 8:30 and 9:00 p.m. that night. He gave the police a statement sometime after the shootings and met with Det. Bender to identify a black shirt he owned that was taken by Mr. Franklin.

Under cross-examination, Mr. Perry expressed the belief that Mr. Franklin and Mr. Johnson were setting him up to take the blame for the shootings by wearing his clothing and having him hold their guns, especially considering that the two

men did not touch their guns without gloves after Mr. Perry had touched them.  On re-direct, Mr. Perry stated that Mr. Franklin called him after the shootings and told him to put on the news.

The State called Phillip Simmers, who was qualified as an expert in the field of forensic DNA analysis and worked for the Louisiana State Police Department Crime Laboratory.  Mr. Simmers identified a copy of the report issued by a serologist in his laboratory.[2]  A black long sleeve shirt, a black hooded sweatshirt, a pair of brown boots, a pair of white, green and black shoes, a pair of latex gloves, a pair of black shorts, a black long sleeve shirt, a black T-shirt, a black T-shirt with a red and black design on the front, a black jacket, and a black long sleeve T-shirt were submitted for a serology analysis.  Swabs from the articles of clothing, along with two hairs, were also submitted for a serology analysis.  The items that were tested were found negative for blood.

[2]According to Mr. Simmers' testimony, a serology analysis is first performed to identify biological fluids, i.e., blood, semen, saliva or even contact DNA from just touching something.  If that testing is positive, the stains are then sent on for DNA testing.

Mr. Simmers explained that a cutting had been taken from the long sleeve black T-shirt, and that the shirt was initially submitted to the lab for testing without the removed portions.  The cutting was later submitted to the crime lab for separate testing, and was identified in the serology analysis as possibly containing blood.  After reviewing the report, Mr. Simmers conducted a DNA analysis on the cutting.  Mr. Simmers obtained reference blood samples from the victims and oral reference swabs from Mr. Franklin and Mr. Johnson.  Mr. Simmers stated that from the cutting of the long sleeve black T-shirt, he identified a single contributor DNA profile, which was consistent with the DNA profile obtained from Mr. Franklin.  Mr. Simmers calculated the odds that the sample would have come from anyone other than Mr. Franklin were one in 36.7 quintillion of the black population.

The defense called Mr. Wilson to testify.  Mr. Wilson stated that he was not charged with any of the murders.  He testified that in January 2010, lived in Metairie, but stayed at Ms. Walker's house some nights.  Mr. Wilson spent the night before the shootings at Ms. Walker's house.  He stated that Mr. Franklin and Mr. Johnson were also there on the day of the shootings, but he could not remember what time Mr. Franklin came and went from Ms. Walker's house.  Mr. Wilson denied seeing any weapons at Ms. Walker's house prior to the shootings.  He stated that he did not wear anyone else's clothing that night and did not participate in a robbery or killing.

Mr. Wilson denied calling Mr. Franklin on the night of the shootings.  He did see Mr. Franklin the following day when Mr. Franklin came to his house asking about a pair of boots left at Ms. Walker's house.  They did not discuss the shootings.  Mr. Wilson saw Mr. Franklin on the docks prior to trial, and Mr. Franklin accused him of being a rat.

Mr. Johnson testified for the defense. He acknowledged that he pled guilty to manslaughter and received a thirty-five year sentence. He stated that Mr. Franklin had nothing to do with the shootings.

Mr. Johnson said he was at Ms. Walker's house on the day of the shootings along with Mr. Franklin, Mr. Wilson, and Paul Spooner. Mr. Johnson said he and Mr. Spooner (who had been murdered prior to this trial) and a third man (whom Mr. Johnson refused to name because that man was still alive) planned to pull off an armed robbery on January 7, 2010. At approximately 9:00 p.m., Mr. Johnson, Mr. Spooner, and Mr. Wilson left Ms. Walker's house. He said that Mr. Franklin was not with them. After walking around the neighborhood for about an hour, Mr. Johnson, Mr. Spooner, and the third man went to the victims' house. Mr. Johnson and Mr. Spooner were armed with hand guns. The third man carried an AK–47. The three men were dressed in black clothing and wore gloves and face coverings at the time of the shootings. Mr. Johnson denied that any of the shooters wore clothes belonging to Mr. Perry. The three men went to the victims' house and knocked at the back door. No one answered, but a man (Mr. Harris) came around from the front of the house into the rear yard. They pointed their guns at Mr. Harris and told him to stay put. Mr. Johnson and the third man entered the house through the front door where they encountered a female in the bedroom. They demanded drugs and money. Mr. Johnson left the house while the third man watched the two females. Mr. Johnson walked into the rear yard where Mr. Spooner had Mr. Harris on the ground. Mr. Johnson heard multiple gunshots fired inside the house. At that point, Mr. Johnson shot Mr. Harris in the head. Mr. Johnson and Mr. Spooner jumped over some fences and fled. Three days after the shooting, Mr. Johnson fled to New York, but later returned to New Orleans and turned himself in.

Mr. Johnson said that he first gave defense counsel Mr. Spooner's name while incarcerated at Hunt Correctional Center, which was after Mr. Spooner's death and Mr. Johnson's guilty plea. Mr. Johnson stated that he was willing to give up Mr. Spooner's name because he was dead.

Mr. Johnson also said that the third man who participated in the shootings was still alive, but defense counsel promised not to ask him to identify the man in order for Mr. Johnson to testify at this trial.

During further questioning, Mr. Johnson denied that the murders had anything to do with the victims being in competition with him and Mr. Franklin in the sale of drugs. He stated that murder was never intended, only robbery.

Under cross-examination, Mr. Johnson admitted that the prosecutor did not visit him in Hunt Correctional Center or promise that he did not have to name the third man. When asked, Mr. Johnson again refused to name the third man. Mr. Johnson claimed that when he pled guilty in this case, he did not mean to implicate Mr. Franklin, although Mr. Franklin's involvement was stated in the factual basis for the plea. Mr. Johnson admitted that although Mr. Franklin's defense attorney

said in opening statement that Mr. Wilson was one of the shooters, he maintained that Mr. Wilson was not the third man.

Mr. Johnson claimed that he was testifying in this case because he did not want an innocent man (Mr. Franklin) to serve time for something he did not do. Mr. Johnson acknowledged that Mr. Franklin had been in jail four years before he (Mr. Johnson) chose to tell anyone that Mr. Franklin was not involved.

Mr. Franklin testified on his own behalf and denied his involvement in the murders. He said that he was living on N. Villere Street at the time of the murders, but often hung out on Urquhart Street selling crack and cocaine. Mr. Wilson, Mr. Johnson, Mr. Perry, and Mr. Spooner would also frequent the house on Urquhart Street. Mr. Franklin said that there was an AK rifle at Ms. Walker and Ms. Smith's house that everybody would handle or play with. Mr. Franklin denied that the rifle was his. Mr. Franklin also denied taking Mr. Perry's clothes. Mr. Franklin said he knew of the victims, but never had any disagreements with them.

Mr. Franklin testified that on the night of the murders, his girlfriend, Ms. Dilbert, went to Ms. Walker's residence to pick up her cell phone that Mr. Franklin had left there. He stated that he accompanied her only part way to Ms. Walker's house because the police were already on the scene. He stated that the next day, Mr. Wilson came to his house and told him about the murders. Mr. Franklin denied that he went to Mr. Wilson's house that day asking about his boots.

On cross-examination, Mr. Franklin stated that he left Ms. Smith's residence that night between 8:00 and 10:00.m. and went to his home on N. Villere Street where he hung out with Ms. Dilbert and her daughter for the rest of the night. (The murders occurred around 11:45 p.m.).

The State called Ms. Dilbert on rebuttal. She contradicted Mr. Franklin's account of the night of the murders. Ms. Dilbert testified that she worked until 9:30 p.m. that night. She stated that it was late when she got off the bus so she called Mr. Franklin to meet her. Mr. Franklin instructed her to walk to Ms. Smith's house to borrow sugar. Ms. Dilbert did not know Ms. Smith or Ms. Walker. When she arrived at their residence, she saw numerous police officers near the house. After speaking with police, Ms. Dilbert walked to her house on N. Villere Street where she met Mr. Franklin sometime after midnight.[13]

---

[13] Franklin, 198 So.3d at 1223-29; State Rec., Vol. 1 of 17.

### III. Petitioner's Claims

**A.    Denial of Challenge for Cause**

Franklin claims that the state trial court's denial of his challenge for cause against a prospective juror denied him due process.  He claims the prospective juror, Gregory Hangartner[14], who was a law clerk for a recused state district court judge, should have been excused because his employment history would have naturally caused him to view the case in a pro-prosecution light.  Petitioner claims the prospective juror was in a position to unduly influence the rest of the jury.  He further claims his appellate counsel was ineffective for failing to raise the issue on appeal.

The state district court denied these claims holding:

> Claim one alleges that Movant was denied due process when during voir dire his challenge for cause against an Orleans Parish Criminal Court Judge's law clerk was denied.  All of the judges of Criminal District Court recused themselves due to a surviving victim's father being a long-time courthouse employee.[1]  Defense counsel challenged for cause prospective juror #20, a former employee of the District Attorney's Office and a law clerk for a presiding Judge.  The trial Judge denied the challenge for cause.  Movant claims that this denial was erroneous and that prejudice should be presumed.
>
> _____
> [1] Judge Wally Rothschild was appointed ad hoc to preside over the trial.
>
> A trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire *voir dire* reveals the judge abused his discretion.  State v. Dotson, 16-0473, p. 5 (La. 10/18/17), 234 So.3d 34, 39 (citation omitted).  This standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys."  Id., p. 17, 234 So.3d at 45 (citations omitted).  "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record."  Id.
>
> For a defendant to prove reversible error warranting reversal of both his conviction and sentence, he need only show erroneous denial of challenge for cause, and use all his peremptory challenges.  State v. Hart, 96-697 (La. 3/7/97), 691 So.2d 651.
>
> Defense counsel challenged Juror #20 based upon his employment with a recused criminal court Judge and the concern that the potential juror may recognize

_____
[14] The undersigned attended law school with Hangartner, but has had no contact with him in over thirty years.

the court employee who was the father of a surviving victim. Juror #20 specifically stated that he "did not know anything about this case." Voir Dire Transcript, p. 133. The juror stated that he did not even know that the Judge that he worked for had recused herself in this matter. Transcript, p. 133, lines 15, 16.

Juror #20 was also called into chambers to discuss whether he knew why his Judge recused herself. The Juror stated that he did not know why she recused herself, that he had no interaction with the survivor's father/court employee, and that he doesn't get involved with that aspect of the Court. The State believed that all of the Judges recused themselves due to the Criminal District Court's employment of the surviving victim's father. The Juror reiterated that the victim's father's employment with the Criminal Court would not affect him one way or another. Transcript p. 163-165. Based on the above, this Court does not find that the Movant has shown that the denial of his challenge for cause was erroneous.

Movant further alleges in his first claim that his appellate counsel was ineffective for failing to raise the above addressed issue on appeal. A claim of ineffective assistance is reviewed under the two part test set out in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). In order to prevail, a defendant must establish both that counsel's performance was deficient and that the deficiency prejudiced the defendant. To carry the burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different.

Because this Court has determined that the challenge to Juror #20 was not erroneously denied, this Court also finds that the issue was not a viable error to raise on appeal and would have been frivolous. Therefore, Movant does not show that appellate counsel's performance was deficient and fails to satisfy the first prong of the Strickland test. The claim that appellate counsel was ineffective for failing to appeal this issue is therefore denied.[15]

The Louisiana Supreme Court found that petitioner failed to meet his post-conviction burden of proof under La. Code Crim. P. art. 930.2 and that he failed to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[16]

Franklin's claim that the trial court's denial of defense counsel's challenge for cause violated his due process rights warrants little consideration in this federal habeas corpus

---

[15] State Rec., Vol. 15 of 17, Ruling On Post-Conviction Application of May 20, 2019, pp. 1-39.
[16] Franklin, 294 So.3d at 1048.

proceeding.  Regardless of whether Hangartner should have been excused for cause, petitioner's claim clearly fails for an entirely different reason.  After the challenge for cause was denied, *defense counsel used a peremptory strike to remove Hangartner from the jury.*[17]  Where, as here, a juror is removed through use of a peremptory strike after the denial of a challenge for cause, the petitioner is entitled to federal habeas corpus relief only if he demonstrates that the jury *ultimately selected* to try the case was *not impartial*.  Ross v. Oklahoma, 487 U.S. 81, 85-86 (1988).  In Ross, the Supreme Court further expressly noted:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury.  We have long recognized that peremptory challenges are not of constitutional dimension.  They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

Id. at 88 (citations omitted); accord Edwards v. Stephens, 612 F. App'x 719, 722 (5th Cir. 2015) ("[T]he forced use of a peremptory challenge does not rise to the level of a constitutional violation.  Instead, a district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." (citation and quotation marks omitted)).

While Franklin states that he exhausted all of his peremptory challenges, he has not identified any juror who was not impartial.  Because defense counsel used a peremptory strike to remove Hangartner and because petitioner made no effort to establish that the jury ultimately selected was not impartial, his due process claim necessarily fails.  Dorsey v. Quarterman, 494 F.3d 527, 533 (5th Cir. 2007); Lagrone v. Cockrell, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sept. 2, 2003); Arita v. Cain, Civ. Action No. 11-636, 2011 WL 4738666, at *29 (E.D. La. Aug. 25, 2011), adopted, 2011 WL 4738658 (E.D. La. Oct. 6, 2011), aff'd, 500 F. App'x 352

---

[17]State Rec., Vol. 13 of 17, voir dire and closing argument transcript of November 3 and 8, 2014, p. 170.

(5th Cir. 2012); <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *27 (E.D. La.

Mar. 8, 2010), <u>aff'd</u>, 434 F. App'x 405 (5th Cir. 2011), <u>Stoves v. LeBlanc</u>, Civ. Action No. 04-

2037, 2010 WL 3523012, at *12 (E.D. La. Apr. 10, 2009), <u>adopted</u>, 2010 WL 3522957 (E.D. La.

Sept. 1, 2010); <u>Wilson v. Cain</u>, Civ. Action No. 06-890, 2009 WL 2163124, at *12 (E.D. La. July

16, 2009), <u>aff'd</u>, 641 F.3d 96 (5th Cir. 2011).

That result is not changed by the fact that Louisiana state law provides relief when a

defendant's challenge for cause is erroneously denied and the defendant exhausts all of his

peremptory challenges.[18]  Because that is a protection afforded only by *state* law, a violation of

that protection does not warrant federal relief.  <u>Lovell v. Vannoy</u>, Civ. Action No. 17-5836, 2018

WL 3104182, at *5 (E.D. La. Apr. 2, 2018), <u>adopted</u>, 2018 WL 3094248 (E.D. La. June 21, 2018);

<u>Hebert v. Vannoy</u>, Civ. Action No. 17-2784, 2017 WL 6989108, at *7 (E.D. La. Dec. 20, 2017),

<u>adopted</u>, 2018 WL 466167 (E.D. La. Jan. 16, 2018).  Federal habeas corpus relief may be granted

only to remedy violations of the Constitution and laws of the United States; mere violations of

state law will not suffice.  28 U.S.C. § 2254; <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1983).

Thus we are left with these facts: 1) Hangartner was ultimately stricken using a peremptory

strike and did not serve as a juror.  2) Franklin has not even argued, much less shown, that the jury

ultimately selected was not impartial.  3) Louisiana's law providing relief when a challenge for

cause is erroneously denied and the defendant exhausts all of his peremptory challenges is a

protection afforded by *state law,* and thus a violation of that protection does not warrant federal

relief.  As such, Franklin's additional claims regarding Hangartner's alleged impartiality are all

---

[18] <u>See</u> <u>State v. Taylor</u>, 875 So. 2d 58, 62 (La. 2004) ("In order for a defendant to prove reversible error warranting
reversal of both his conviction and sentence, he need only show the following: (1) erroneous denial of a challenge for
cause; and (2) use of all his peremptory challenges.  Prejudice is presumed when a defendant's challenge for cause is
erroneously denied and the defendant exhausts all his peremptory challenges.  An erroneous ruling depriving an
accused of a peremptory challenge violates his substantial rights and constitutes reversible error." (citations and
footnote omitted)).

irrelevant. Even if he had properly and timely raised objections to, or could prove that as a former employee of the District Attorney's Office, Hangartner "naturally' would have viewed the case in a pro-prosecution light; that the judge for whom Hangartner worked had recused herself from the case; that the surviving victim's father was an employee of the court; that Hangartner had sat ad hoc in the past, it would not matter. Because Hangartner did not serve as a juror.

Franklin further claims that his appellate counsel was ineffective for failing to raise on appeal the denial of the challenge for cause. Franklin claims that his appellate counsel "should have been aware of the numerous judges who recused themselves and the reasons therefore."[19]

Appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." Id. at 753. As a result, when assessing a claim alleging ineffective assistance of appellate counsel, the court looks to whether the issues ignored by appellate counsel were "clearly stronger" than the issues actually presented on appeal. See, e.g., Diaz v. Quarterman, 228 F. App'x 417, 427 (5th Cir. 2007); accord Smith v. Robbins, 528 U.S. 259, 288 (2000).

In the direct appeal in this case, appellate counsel raised a single claim, namely that Franklin was denied a fair trial due to prosecutorial misconduct during the state's closing argument.

___

[19] Rec. Doc. 4-1, p. 25.

Although the state courts ultimately denied that claim, it was not frivolous – and, more importantly, it was stronger than the claim petitioner now suggests should have been brought concerning the denial of the challenge for cause.

**B.    Ineffective Assistance of Trial Counsel**

Franklin claims that he received ineffective assistance of his trial counsel, as well. Specifically, he claims that his trial counsel was ineffective for failing to (1) call two witnesses to testify in his defense; (2) impeach certain witnesses for the prosecution; and (3) object to the state's improper comments and request a mistrial.

The United States Supreme Court has established a two-prong test for evaluating such claims. Specifically, a petitioner seeking relief on such a claim is required to show *both* that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984). The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to

'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690).  The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793.

In the instant case, petitioner asserted his ineffective assistance of trial counsel claims on collateral review, and the state courts denied those claims on the merits.  The state district court expressly addressed the claims concerning trial counsel, holding:

> Movant's second claim alleges that trial counsel was ineffective for failing to call as witnesses two subpoenaed persons whose testimony would have benefitted the defense.  Numerous allegations are submitted as to why these two individuals should have been called as witnesses at trial.  This Court addresses below each claim individually.  The same test provided in <u>Strickland</u>, Id., applies to each claim of ineffective assistance.

> The first witness that Movant alleges should have been called is Crystal Smith.  Ms. Smith was with the Movant on the night of the shooting, but not present at the shooting.  Her home, where the Movant spent much of his time, was across the street from where the shooting occurred.  Movant believes that had Ms. Smith been called as a witness at trial, her testimony could have contradicted Ms. Brittney Walker's trial testimony which was inculpatory for the Movant.

Ms. Walker testified at trial that after Movant and "Red" left Crystal Smith's house she heard gunshots about 5 minutes later. Transcript, p. 193, lines 15-19. Movant alleges that Crystal Smith would have testified that Movant left her house an hour to an hour and a half prior to hearing any gunshots, contradicting Ms. Walker's testimony. This Court reviewed the testimony and statements of both parties. Crystal Smith's summarized statement prepared by defense counsel provides that at approximately 10:30 p.m. on the night of the shooting, "Crystal was very drunk and had to lie down before she got sick." Movant's Exhibit J. She also had to lie down before getting sick which makes this Court question whether Crystal actually knew what time it was when Movant and "Red" actually left the house or how long afterwards she heard the shots. Additionally, Ms. Crystal Smith had a very close relationship with the Movant. This Court does not believe that Crystal's testimony regarding time would have been reliable due to her admission of drinking and smoking pot and her motive to lie for her boyfriend/friend.

Moreover, on cross examination, discrepancies as to Ms. Walker's statements regarding when the Movant and "Red" left the house and when she heard shots were revealed through her trial testimony via comparisons with previous statements. Ms. Walker had previously stated that the time lapse was longer than thirty minutes. The jury heard discrepancies and made a factual finding regarding the credibility of Ms. Walker's testimony based upon her direct and cross examination testimony as well as other evidence admitted during trial.

Based on the above, this Court finds that trial counsel's performance was not deficient in choosing to omit Crystal Smith as a witness regarding the time lapse between Movant and "Red" leaving her home and the time of hearing shots. The first prong of the Strickland test is not met, and this claim is denied.

Movant further complains that Ms. Smith would have testified that Ms. Walker was asleep at the time the shots were heard which would cast doubt on the timing between the Movant and "Red" leaving Ms. Smith's house and the shots. Ms. Smith actually stated that she and Ms. Walker "went and got in the bed" after the guys left. Movant's Exhibit H, page 13. Ms. Smith cannot say that Ms. Walker was actually asleep. Therefore, this piece of testimony would not have been helpful to the defense. Failing to call Ms. Smith to testify to what Ms. Walker knew did not prejudice the Movant in any way and this claim is denied.

Movant also alleges that had Ms. Smith been called as a witness she would have contradicted Ms. Walker's testimony as to whether the Movant and "Red" left the house with guns. Ms. Smith denied that guns were allowed in her home at all. See Movant's Exhibit H, p 11-12. Ms. Walker provided a photograph that she had taken at Ms. Smith's home of "Red" posing with an AK-47 rifles and on another occasion seeing Movant with the AK-47. Ms. Walker and Jonny Perry both testified that the guns were always at the home. Mr. Perry further testified that on the night of the shooting, before he went to bed around 8:30, Movant and "Red"

were passing guns back and forth, a "Chinese SK" (Chopper), and a 380. Mr. Perry was even concerned because he had held one of the weapons at some point.

Considering Ms. Smith's relationship with the Movant, the photograph of the AK-47 rifle in Ms. Smith's home, and both Ms. Walker and Mr. Perry's testimony, this Court finds that Ms. Smith's testimony would have been suspect at best and likely not believable and therefore not beneficial. Moreover, detectives discovered on the scene casings matching numerous rounds of AK-47 assault rifle ammunition found in a bag near the residence of Movant's home on N. Villere St. The investigation revealed that one AK-47 and one 380 caliber gun were used in the shootings. These weapons match the ammunition and photographs of the weapons in possession of Movant and "Red".

Based on the above, this Court does not believe that Ms. Smith's testimony regarding whether Movant and "Red" were armed when they left her home would have been beneficial to the defense. Ms. Smith provided in her statement that the shooting was an hour to an hour and a half after the men left her home. If you believe Ms. Smith's timing, the men could have gone to get guns from another location. Two other witnesses contradicted Ms. Smith's account of the actions that night. This Court does not believe that defense counsel's decision to omit Ms. Smith as a witness regarding the weapons constituted deficient performance. Because there is no finding of deficient performance, Movant has failed to satisfy the first prong of the <u>Strickland</u> test. This claim of ineffective assistance of counsel is therefore denied.

Movant's next claim of ineffective assistance alleges that had Ms. Smith been called to testify she could have contradicted Ms. Walker's testimony regarding Ms. Smith being choked by Movant, whether Movant and "Red" were at Ms. Smith's house 24/7, and could have cast doubt on Ms. Walker's general testimony due to threats by a Latino detective.

Ms. Smith admitted in her own statement that she and Movant would joke wrestle and he would "like choke me up" and say "why you cheating on me," and "we would be in the house you know punching on each other you know all that. Get the belt, whoop on each other and stuff, but it got this one time we all in bed you know pretending like we fighting we punching on each other kicking on…" This portion of Ms. Smith's own statement would certainly not contradict Ms. Walker's testimony that the Movant had been or at least appeared to be choked and abusive toward Ms. Smith. See Movant's Ex. H, lines 344-349 and 396-406.

Ms. Smith also admitted in her statement that Movant was at her house 24/7, and that Dwayne, "Red" was there if Brittany was there because they "hit it off". Movant's Ex. H, Lines 102-106 and 443-448. Therefore, Ms. Smith's testimony would not have contradicted Ms. Walker's testimony and assisted the defense in any way.

The final claim is that Ms. Smith, had she been called to testify, could have cast doubt on Ms. Walker's testimony because Ms. Walker was allegedly pushed into testifying after being threatened by a Latino detective.   Ms. Walker was questioned before the jury regarding threats by the police to take her daughter from her (Transcript p. 214, lines 7-9), threatened to arrest her for possession of marijuana (Transcript p. 214, lines 4-6), and threatened to charge Ms. Walker and Ms. Crystal with accessory after the fact for the murders, (Transcript p. 214, lines 10-13).  All of this information was presented before the jury for consideration as to the reliability of Ms. Walker's testimony.  There is nothing that Ms. Smith could have added in regards to threats made to Ms. Walker in exchange for testimony favorable to the State.  This claim is therefore denied as unfounded.

Movant's next claim of ineffective assistance of counsel alleges that Ms. Smith should have been called as a witness to explain that a prior dispute between the defendants and the victims was over and provided no motivation for the shooting.  All parties agreed that a November dispute between the defendants and the victims originated over drug sales and the belief that the girls across the street were selling Movant's drugs.  Johnny Perry testified at trial regarding one "verbal disagreement about drug transactions."  He stated that there was no violence, and described it as a "minor altercation".  Transcript pp. 103-104.  Perry also testified that "Red" was talking and Movant was just looking.  "He was just like all right, whatever."  Transcript p. 103, lines 7, 8.

Ms. Smith's statement provides that there were two incidents between the defendants and the girls (victims) across the street, one back in November 2009, and one in January 2010, when the girls (victims) knocked on Ms. Smith's door to talk to Movant.  The shootings occurred on January 7, 2010.  This Court does not believe that trial counsel's decision to omit Ms. Smith's personal belief that the "beef" was "squashed" based on her seeing the defendants and the girls "sitting together smoking and chillin" constitutes deficient performance.  Movant's Exhibit H, pp. 7-9.

Furthermore, should Ms. Smith had been called to the witness stand, the State would have been allowed to ask her about information in her statement regarding why she and Ms. Walker were listening to the conversation between the two defendants and the girls (victims).   Ms. Smith's statement reveals the following: "So me and Brittany we listening we like wonder what's you know, what's going to be said and I'm like if something jump off bitch I hope you know we going out there.  'Cause we ain't letting "Tyga" hit no female."  Movant's Exhibit H, p. 8.  The statement then gets into Movant's joke choking and pretend fighting and punching and kicking on each other.  Movant's Exhibit H, p. 9.

Ms. Smith's statement also confirms Ms. Walker's testimony regarding the girls across the street accusing him of robbing Ms. Smith's house as well as Movant's possession of the weapons identified in the shootings.  These reasons alone may constitute defense trial counsel's strategy in choosing to omit Ms. Smith

as a witness.  Based on the above, the claim that counsel was ineffective for deciding that Ms. Smith should not be called as a witness is denied.

Movant's next ineffective assistance of counsel claim alleges that trial counsel was deficient for failing to call Mr. Vincent Williams as a witness.  Mr. Williams was interviewed by defense counsel three years after the shooting.[2]  Mr. Williams stated to defense counsel that he met Movant in 2009, a year before the shooting incident, but could not remember where.  Mr. Williams does not know "Red", or any of the other people discussed in relation to the case, Arnold Wilson (Slim), Rob, Crystal Smith, or Brittany Walker.  Mr. Williams told defense counsel that he was sitting with his "baby mama" on their porch approximately one-half block away from the shootings.  At approximately 8:00 p.m. he saw Movant leave Crystal Smith's home and walk down the street alone.  He and his girlfriend were then told by four guys, all dressed in black, to get off the block because something was going to go down.  He did not notice any weapons.  Mr. Williams and his girlfriend then left the area.  This all occurred around 8:00.  The shootings occurred shortly before midnight on January 7, 2010.  This Court does not believe Mr. Williams' above statements to be exculpatory to the defense.

[2] Movant presents his interview notes as Exhibit L rather than an affidavit from Mr. Williams.  This Court finds that the absence of an affidavit signed by Mr. Williams is irrelevant since the content of his statement does not provide exculpatory evidence for the Movant.

Mr. Williams cannot account for any occurrences between 8:00 and midnight.  He does not provide any information as to where the Movant went for four hours, whether he returned to Ms. Smith's home, the are in general, or joined others who were dressed in black.  Mr. Williams was not shown any photographs in an attempt to identify the other men who dressed in all black (as were the Movant, and "Red" when they left Ms. Smith's home).  This Court does not see how this information, presented by a man facing second degree murder charges, would have benefitted the defense.

Defense counsel's decision to omit Mr. Williams as a witness does not constitute deficient legal performance and certainly does not satisfy the first or second prong of the <u>Strickland</u> test.  The claim of ineffective assistance is therefore denied.

Movant's next ineffective assistance claim alleges that trial counsel was deficient for failing to impeach Johnny Perry and Brittany Walker with their prior statements that contained inconsistent information.  Movant specifically complains about the "voluntariness" of Ms. Walker's statement and testimony not being addressed.  However, Movant acknowledges in this Application that "Although Ms. Walker testified that she was not threatened, she later testified to the ways in which she was threatened."  Ms. Walker testified at trial that she was told by the police that she was going to be taken to jail for any drugs found in the house.  She was also told by an officer with his gun drawn that they could do this the easy way or the hard way.  Trial Transcript pp. 202-203.  The information regarding threats made to Ms. Walker was presented before the jury at trial for consideration by the

jury.  The jurors, as the fact finders, were also able to use that information to determine the reliability and credibility of Ms. Walker's testimony.  This claim is therefore unfounded and denied.

Movant also alleges that trial counsel was ineffective for failing to impeach Mr. Perry with a prior statement when he didn't previously reveal that he was concerned that his fingerprints could have been discovered on a gun used in the shooting.  Defense counsel did however ask Mr. Perry, "All of this information that you are volunteering today you didn't volunteer it the day that the police came in." Transcript p. 119.  Defense counsel also asked Mr. Perry on cross-examination, "Why didn't you tell them anything that night?" indicating that Mr. Perry's testimony was different than his original statement.  Transcript, p. 122.  At one point, Mr. Perry himself stated "If you looked at the statement that you just flagged in my face you will see that I said he had a Rally's uniform on."  Transcript p. 124. This provides proof that Mr. Perry's prior statement containing inconsistencies with his trial testimony was revealed to the jury.

Defense counsel further revealed during cross-examination that the State had provided Mr. Perry with a hotel room for approximately a week and paid for meals before Mr. Perry made any statement.  This Court finds that any threats and/or promises that influenced Mr. Perry's testimony were revealed during trial for the jurors' consideration.  This claim is also unfounded and denied.

Movant's allegations of ineffective assistance based on clothing description inconsistencies are also unfounded based on the fact that any inconsistencies regarding clothing were not only presented to the jury via testimony, but also argued during closing arguments.  Therefore, the above claims of ineffective assistance fail to show that trial counsel performed deficiently and do not satisfy even the first prong of Strickland, Id., test.  They are therefore denied.

Movant's final claim of ineffective assistance alleges that trial counsel was deficient for failing to object and move for a mistrial when the State made improper comments to the jury.  More specifically, Movant argues that the State improperly associated Mr. Franklin (Movant), with Mr. Johnson (Red).  "Red" testified before the jury that he was guilty and his charged was reduced to manslaughter, "Red" also testified that he committed the murders with two individuals, neither of which were Movant.  All of this information was presented to the jury.  The statements made to the jury in closing arguments by the State were merely their theory of the case that despite "Red's" testimony had and Movant were together on the night of the shootings.

Movant also complains that the State improperly used "character" evidence depicting him to be a drug dealer who was angry and in a turf war with the victims. The evidence, as reported by many witnesses, regarding Movant's occupation as a drug dealer and the dispute between he and the victims were part of the res gestae and motive.  The State's reference during closing argument to these reported facts

24

were again simply the State's theory of the case and not improper. Therefore, trial counsel cannot be found deficient for not objecting to argument which is based upon admitted evidence. This claim is denied.

This Court, after review of all claims and transcripts, believes that witness testimony inconsistencies, motivations, and influences were presented to the jurors for their determination of credibility, weight, and reliability. This Court further believes that the Movant received a fair and just trial resulting in a conviction obtained in accordance with the U.S. and Louisiana Constitution.

Based on the above, this Application for Post-Conviction Relief fails to allege a claim which, if established, would entitle the Movant to relief. It is therefore dismissed pursuant to La. C. Cr. P. Art. 928 with the above stated reasons.[20]

The Louisiana Supreme Court denied petitioner's writ application finding he did not meet the Strickland standard.[21]

Because petitioner's ineffective assistance of counsel claims were denied on the merits, and because such claims present mixed questions of law and fact, petitioner is entitled to federal habeas relief on the claims only if he shows that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims is in *fact doubly* deferential:

The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

---

[20] State Rec., Vol. 15 of 17, Ruling on Post-Conviction Application, of May 20, 2019, pp. 2-11.
[21] Franklin, 198 So.3d at 1222; State Rec., Vol. 1 of 17.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted). Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential

standards, it simply cannot be said that relief is warranted with respect to any aspect of petitioner's ineffective assistance of counsel claims.

1.     **Uncalled Witnesses**

Petitioner claims his trial counsel was ineffective in failing to call Crystal Smith and Vincent Williams.   He claims that Smith would have rebutted certain aspects of Brittany Walker's testimony.   He specifically claims that Smith would have testified that: (1) Franklin left the area prior to the gunshots; (2) Walker was asleep when she claimed to hear gunshots and would not have known how much time passed after Franklin and Johnson left the residence; (3) Franklin and Johnson were not armed when they left the residence; (4) a detective threatened to take away Walker's children if she did not cooperate; (5) Franklin never choked or abused Smith; and (6) Johnson and Franklin were not constantly present at Smith's residence.   Franklin claims that Williams would have testified that he observed Franklin leave the area prior to the murders. Franklin also claims that Williams would have also testified that Williams was approached by four unknown individuals who advised him to leave the area because something was "going to go down."

The <u>Strickland</u> framework applies in the context of uncalled witnesses.  Franklin must show that (1) counsel's failure to call witnesses fell below an objective standard of reasonableness and (2) there is "a 'reasonable probability' that the uncalled witnesses would have made [a] difference to the result." <u>Bray v. Quarterman</u>, 265 F. App'x 296, 298 (5th Cir. 2008) (quoting <u>Alexander v. McCotter</u>, 775 F.2d 595, 602 (5th Cir. 1985)).  It is well settled that " '[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.' "

Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)); Bray, 265 F. App'x at 298.

To prevail, Franklin must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009). The Fifth Circuit has "clarified that the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.' " Hooks v. Thaler, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting Woodfox, 609 F.3d at 808).

Moreover, the Fifth Circuit has consistently denied ineffective assistance of counsel claims when the defendant has failed to present some evidence from the uncalled witness, by affidavit or otherwise, setting out the content of the witness's testimony, and that the witness was available to testify and would have done so. Gray v. Epps, 616 F.3d 436, 443 (5th Cir. 2010) (noting that the absence of an affidavit from two lay witnesses indicating a willingness to testify "does not allow [the Court] to conclude" that the two witnesses would have testified at trial); Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) (noting that the "[petitioner] has never provided any court with affidavits (or similar matter) from any of the unidentified favorable witnesses suggesting what they would have testified to," rendering the petitioner's representation on the impact of the proposed testimony "conclusory speculation").

Franklin cannot show that the failure to call Williams was prejudicial in any way. Defense counsel apparently interviewed Williams on January 30, 2013, more than three years after the murders.[22] Williams claimed to have met Franklin in 2009, although he could not remember where

---

[22] Defense counsel's notes of Williams' interview, referred to by Franklin and the state district court as "Exhibit L," are not included in the state court record nor did petitioner file a copy of them with his petition. By order dated

he met him.[23]  He claimed that, at approximately 8:00 p.m. on the evening of the shootings, he and

his girlfriend were sitting on their porch on Urquhart Street, about one-half block away from the

victims' residence.[24]  Williams claimed saw Franklin leave Smith's house and walk down the street

alone.[25]  Almost immediately thereafter, he saw four men, dressed in black, who told Williams

and his girlfriend to get off the block because "something was going to go down."[26]  Williams did

not see any weapons on the men.[27]  He and his girlfriend then left the area.[28]

Initially, the failure to produce an affidavit from Williams severely undermines a claim of

ineffective assistance to call him to testify at trial.  Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir.

2001).  Further, Franklin has not shown that Williams was willing and available to testify at trial,

which commenced 22 months after his statement to defense counsel.  See Woodfox, 609 F.3d at

808; Day, 566 F.3d at 538.

Moreover, Williams' credibility is questionable.  Williams was facing second degree

murder charges at the time of his statement to defense counsel.  His statement, which was given

three years after the murder, is not particularly reliable.  See Strayhorn v. Booker, 718 F. Supp. 2d

846, 874 (E.D. Mich. 2010) (noting that "[l]ong-delayed affidavits" are "treated with a fair degree

of skepticism").  Even if Williams' statement were to be believed, Williams, by his own admission,

was not in the area at the time of the shootings, which occurred nearly four hours after he saw

---

October 29, 2021, petitioner was instructed to supplement the record with a copy of the exhibits referred to in his
habeas petition and application for post-conviction relief.  Rec. Doc. 19.  On November 30, 2021, petitioner filed a
response with some exhibits, however, he did not include Exhibits H, J, L or N, which exhibits the state district court
referred to in denying post-conviction relief.  Rec. Doc. 20.  Petitioner specifically stated that he did not include
Exhibit J because his legal documents are in storage.  Id., at p. 1.  He did not explain why he did not file copies of
Exhibits H, L or N, although, presumably, those documents are also in storage.  As neither party contests the
correctness of the state district court's summary of the content of Exhibit L, this court accepts the district court's
summary of the statements alleged to be in the exhibit as true.

[23] State Rec., Vol. 15 of 17, Ruling on Post-Conviction Application, of May 20, 2019, p. 8.

[24] Id.

[25] Id.

[26] Id.

[27] Id.

[28] Id.

Franklin.  He could not account for Franklin's whereabouts after 8:00 p.m., after Williams and his girlfriend left the area.  Franklin has not shown a reasonable probability that the outcome of his trial would have been different had Williams testified.  He, therefore, has failed to show any prejudice as a result of his counsel's failure to call Watson to testify at trial.

As for defense counsel's failure to call Smith to testify at trial, "[c]ourts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and scrutiny of counsel's performance must be highly deferential."  Rose v. Flores-Ortega, 528 U.S. 470, 120 S. Ct. 1029, 1034-35, 145 L. Ed. 2d 985 (2000).  For many reasons, counsel's decision not to call Smith at trial was not unreasonable.

Franklin claims that certain statements by Smith would have contradicted Walker's testimony which implicated petitioner.[29]  Initially, petitioner claims that Smith's proposed testimony would have called into question Walker's testimony regarding the time lapse between when Franklin and Johnson left the residence and when Walker and Smith heard gunshots.  However, after Walker testified that she heard gunshots three to five minutes after Franklin and Johnson left the house, Walker admitted that she had previously told the police that she had heard gunshots no longer than thirty minutes after the men left.[30]  Franklin further claims that Smith would have testified that a detective threatened to take Walker's child if she did not tell police what they wanted to know.  On cross-examination, however, Walker admitted that the police threatened to take her daughter away from her.[31]  Thus, these aspects of Smith's proposed testimony would have been cumulative of Walker's testimony.  "Counsel's decision not to present

---

[29] Petitioner refers to Exhibits H and J, a transcribed statement made by Smith on August 24, 2012, and a summary of her statement given to defense counsel on November 15, 2012.  Again, neither of the exhibits are included in the state court record and petitioner did not include them when he supplemented the record.  As neither party disputes the correctness of the state district court's recitation of the information gleaned from the statements, this court accepts the state district court's recitation of the assertions made by Smith in her statements to defense counsel as true.
[30] State Rec., Vol. 10 of 17, trial transcript of November 3, 5-8, 2014, pp. 193, 211-212.
[31] Id., at p. 214.

30

cumulative testimony does not constitute ineffective assistance." <u>Gardner v. Davis</u>, 779 F. App'x 187, 193 (5th Cir. 2019) (citations omitted), <u>cert. denied</u>, 140 S. Ct. 842 (2021).

While Franklin claims that Smith could have provided other beneficial testimony, many of Smith's statements to defense counsel contradict her statement to police she gave hours after the shootings.  For instance, while Smith told defense counsel Franklin and the women across the street had "squashed" the beef between them, she told police that just days before the shootings, Franklin had threatened the women.[32]  She specifically stated that just days prior to the shootings. Franklin had a heated conversation with the victims and she heard him say, "Y'all gonna get y'all," to which one of the females responded, "You gonna get a gun?  You gonna kill me?"[33]  She explained that Franklin was increasingly upset with one of the victims following the confrontation as she kept "mugging" him.[34]

While Smith told defense counsel that Franklin left 60 to 90 minutes before she heard the gunshots, in her recorded statement to police given hours after the shootings, she said she heard gunshots about 10 to 15 minutes after Franklin and Johnson left together.[35]  While Smith told defense counsel that Walker was asleep when Smith heard the shots, she made no such claim to police.[36]  While she told defense counsel that Franklin and Johnson were not armed when they left the residence, she told police that she had seen both men in possession of both guns on the evening of the shootings and that she believed that Franklin had concealed the "Chinese Chopper" in his pants when he left the house.[37]  After they heard the shots, Smith claimed that she and Walker searched their residence for the weapons, but did not find them.[38]  Certainly, the prosecution would

---

[32] State Rec., Vol. 14 of 17, Supplemental Police Report, p. 39.
[33] <u>Id.</u>
[34] <u>Id.</u>
[35] <u>Id.</u>, p. 40.
[36] <u>Id.</u>
[37] <u>Id.</u>, pp. 39-40
[38] <u>Id.</u>, p. 40.

have impeached Smith with her statement made to police which was consistent with the statement and testimony of Walker. Ultimately, had Smith testified, it is likely that her testimony would have been more harmful than helpful to the defense.

Franklin also claims that Smith would have rebutted Walker's testimony that Franklin had choked Smith in the past. However, Smith told police that Franklin had pointed the AK-47 in her face in a threatening manner.[39] She also told police of incidences when Franklin had choked her and when they both kicked and punched one another. Certainly, this testimony would have supported Walker's testimony of abuse by Franklin.

Smith was hardly disinterested given that she and Franklin were in a romantic relationship, so her credibility and motives for testifying on his behalf would necessarily be questioned by the jurors. See, e.g., Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *15 (noting that petitioner's girlfriend would be an inherently suspect alibi witness), aff'd, 370 F. App'x 531 (5th Cir. 2010). Given her conflicting statements and her relationship with Franklin, counsel could well have concluded that Smith would be an unsympathetic witness of dubious credibility and of doubtful value to the defense.

Franklin simply has not shown that defense counsel's failure to call Smith to testify was not within the realm of reasonable trial strategy. Nor has he shown the failure to present Smith as a witness was prejudicial to his defense. The jury had before it testimony that supported Franklin's defense that he was not one of the perpetrators of the murders and that he had left the area hours earlier. The guilty verdict indicates that the jury did not find this testimony credible. Franklin has not shown a reasonable probability that the jury would have believed Smith's testimony.

---

[39] Id., p. 39.

In summary, Franklin has not demonstrated a reasonable probability that the testimony of Smith or Williams would have altered the outcome of the trial. Consequently, he does not succeed on his claim that his lawyer provided ineffective assistance in failing to call these witnesses. He is not entitled to relief as to this claim.

2.    **Failure to Impeach Witnesses**

Franklin next claims his counsel was ineffective for failing to impeach key prosecution witnesses. He specifically claims that his counsel failed to utilize the pretrial statements of Walker and Perry to show that their trial testimony was inconsistent with their statements to police. He also faults counsel for failing to impeach Detective Bender.

The method and scope of cross examination is a type of trial strategy for which counsel is granted reasonable latitude. See United States v. Octave, No. 12-205, 2015 WL 6620117, at *6 (E.D. La. Oct. 30, 2015) (citing Pape v. Thaler, 645 F.3d 281, 291) (5th Cir. 2011). The federal courts have made clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 F. App'x 769 (5th Cir. 2005); accord Lewis v. Cain, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 F. App'x 835 (5th Cir. 2011); Williams v. Cain, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 F. App'x 462 (5th Cir. 2009); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters through the distorting lens of hindsight; rather, courts must employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. It is irrelevant that another attorney might have made other choices or handled

such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

In the instant case, Franklin simply has not met his burden with respect to this claim. Contrary to Franklin's suggestion that his counsel failed to impeach the credibility of Walker, Perry and Bender, a review of the trial transcript shows that defense counsel in fact extensively and effectively cross-examined each of the witnesses and attacked their credibility.

On cross-examination, Perry admitted that he did not speak to the police on the night of the shootings, but rather he gave his statement to police on January 14, 2010, a week later.[40] Perry admitted that the police had punched and kicked him the night of the shootings, handcuffed him, and threatened to arrest him for the murders and drug paraphernalia found in the house.[41] Perry admitted that the police housed him, Walker, and Smith at a nearby hotel and paid for their meals for a week.[42] Perry explained that he gave a statement to police when he realized that his fingerprints may have been on one of the weapons and that the other men may have implicated him in the crime by wearing his clothes.[43] Perry admitted that he did not tell the police that Franklin called after the shootings.[44] Defense counsel questioned Perry regarding how Perry could identify a plain black shirt as his own.[45] Perry also testified on cross-examination that he did not say anyone was wearing a leather jacket and that he did not own a leather jacket.[46]

On cross-examination, defense counsel showed Walker the statement she gave police and she admitted that she had previously told the police she heard shots approximately 30 minutes after

---

[40] State Rec., Vol. 10 of 17, trial transcript of November 2, 5-8, 2014, pp. 115-16, 127.
[41] Id., at pp. 116-17, 122, 134.
[42] Id., at pp. 126-27, 129.
[43] Id., at pp. 127-29.
[44] Id., at pp. 134-35.
[45] Id., at pp. 121-22.
[46] Id., at p. 129.

Franklin and Johnson left.[47]  Walker admitted the police threatened to arrest her for possession of

a roach clip and with accessory after the fact for the murder.[48]  She further admitted that police

threatened to take her daughter.[49]  She testified that police hit Perry in the face.[50]  Walker agreed

that the state paid for her to stay in a hotel.[51]

Bender testified on cross-examination that Perry did not tell him that he feared that the AK-

47 and clothing would have his DNA and fingerprints on them.[52]  Bender further testified that

Perry never told him that he had handled the AK-47.[53]  Bender confirmed that Perry did not give

a statement before the time of the search of Franklin's home, and that he searched for clothing in

Franklin's residence based off the descriptions provided by Walker and Smith.[54]  Bender admitted

that the only clothing item seized that he showed Perry was a black t-shirt, and that Perry's

identification of the t-shirt did not occur until March 2010.[55]  He admitted that they did not find

any pants or shoes or a black leather jacket that may have belonged to Perry.[56]  Bender admitted

that he never interviewed Arnold Wilson.[57]  Bender further admitted that, after reviewing the

statements of Walker and Smith, he realized that neither of them specifically mentioned a black t-

shirt, although Smith described Franklin as wearing "all black."[58]  Bender acknowledged that no

firearms or fingerprints were found, there was no blood from the victims on the clothing seized,

and that Franklin had not fled New Orleans after the murders.[59]

---

[47] Id., at pp. 211-12.
[48] Id., at p. 214.
[49] Id.
[50] Id.
[51] Id., at p. 216.
[52] State Rec., Vol. 11 of 17, trial transcript (con't) of November 3, 5-8, 2014, p. 286.
[53] Id.
[54] Id., at p. 298.
[55] Id., at 298-99, 325.
[56] Id., at 299-300.
[57] Id., at 305-06.
[58] Id., at pp. 310-12.
[59] Id., at p. 313.

Franklin faults his counsel for failing to specifically impeach both Perry and Bender with Perry's pretrial description of the shirt Franklin was wearing on the night of the shootings. Franklin contends that Perry told Bender that Franklin was wearing a grey patterned shirt the night of the shootings.[60]  According to the police report included in the record, Perry "stated that Tiger and Red are clothed in all black except one had on a grey shirt."[61]  The report does not indicate whether Perry identified which defendant was wearing a grey shirt.

Regardless, even accepting as true Franklin's claim that Perry told Bender that Franklin was wearing a grey shirt,[62] and assuming arguendo that defense counsel was deficient in failing to cross-examine Perry and Bender regarding Perry's statement that Franklin was wearing a grey shirt, Franklin has not offered any evidence to demonstrate that this failure altered the outcome of his trial.  His unsupported speculation is insufficient to satisfy the prejudice prong of Strickland. Defense counsel argued in closing argument that neither Perry nor Walker told police that Franklin wore one of Perry's shirts.[63]  Defense counsel pointed out that Perry's identification of the shirt occurred after Bender found it during a search of Franklin's house and thought there was blood on it.[64]  Defense counsel questioned Perry's ability to identify a plain black t-shirt and argued Bender chose to show Perry only the shirt because he believed it had blood on it.[65]  Defense counsel also pointed out that, despite Perry's testimony that he worked hard labor and sweated in his clothes, his DNA was not found on the shirt he identified as belonging to him.[66]  He argued that the shirt

---

[60] Rec, Doc. 4-1, p. 34 citing Exhibit N, p. 5.  Petitioner did not include a copy of Exhibit N, Perry's January 14, 2010 statement to Bender, when he supplemented the record.  See Rec. Doc. 20.
[61] State Rec., Vol. 14 of 17, Supplemental Police Report, p. 55
[62] Defense counsel clearly had a copy of the statement at trial as Perry commented that defense counsel "flagged [it] in [his] face."  State Rec., Vol. 10 of 17, trial transcript of November 3, 5-8, 2014, p. 124.
[63] State Rec., Vol. 13 of 17, voir dire and closing arguments transcript of November 3 and 8, 2014, p. 256, 258.
[64] Id., at 256.
[65] Id., at 256-57.
[66] Id., at 256.

belonged to Franklin.[67]  Defense counsel also pointed out that while Walker and Perry testified that Franklin and Johnson changed from their clothing into Perry's clothing at the residence, there was no evidence that clothing was left behind at Smith's residence.[68]

It is clear from the record that defense counsel attempted to discredit Walker, Perry and Bender through cross-examination in an effort to raise doubt about the reliability of their testimony and in support of Franklin's claim of actual innocence.  The testimony was presented to the jury, which as the trier of fact, weighed and considered the testimony.  The fact that the jury did not believe the defense does not render counsel's performance constitutionally deficient.  See Martinez v. Dretke, 99 F. App'x 538, 543 (5th Cir. 2004) ("[A]n unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted).

Franklin has failed to establish that the denial of relief by the state courts on this ground was contrary to or an unreasonable application of Strickland.  He is not entitled to relief on this claim.

3.    **Failure to Object to Closing Argument & Move for a Mistrial**

Franklin also faults his trial counsel for failing to object to prejudicial comments made by the prosecution and failing to move for a mistrial.  Franklin claims that the prosecution's argument included "several misrepresentations of facts."[69]  He claims he was convicted on the basis of his association with Johnson, who admitted his own guilt but claimed that Franklin was not one of the other two perpetrators.  The state argues that the prosecution's remarks were within a permissible

---

[67] Id., at 259.
[68] Id.
[69] Rec. Doc. 4-1, p. 38.

scope of closing argument and that petitioner fails to show that a mistrial would have been granted had defense counsel moved for one.

The trial court rejected this issue on collateral review, finding:

> Movant also complains that the State improperly used "character" evidence depicting him to be a drug dealer who was angry and in a turf war with the victims. The evidence, as reported by many witnesses, regarding Movant's occupation as a drug dealer and the dispute between he and the victims were part of the res gestae and motive. The State's reference during closing argument to these reported facts were again simply the State's theory of the case and not improper. Therefore, trial counsel cannot be found deficient for not objecting to argument which is based upon admitted evidence. This claim is denied.

> This Court, after review of all claims and transcripts, believes that witness testimony inconsistencies, motivations, and influences were presented to the jurors for their determination of credibility, weight, and reliability. This Court further believes that the Movant received a fair and just trial resulting in a conviction obtained in accordance with the U.S. and Louisiana Constitution.

> Based on the above, this Application for Post-Conviction Relief fails to allege a claim which, if established, would entitle the Movant to relief. It is therefore dismissed pursuant to La. C. Cr. P. Art. 928 with the above stated reasons.[70]

The Louisiana Supreme Court denied petitioner's writ application finding he did not meet the Strickland standard.[71]

The United States Fifth Circuit Court of Appeals has held: "A decision not to object to a closing argument is a matter of trial strategy." Drew v. Collins, 964 F.2d 411, 423 (5th Cir.1992). Further, it has been noted:

> Generally speaking, a failure to object, standing alone, does not rise to the level of constitutionally deficient performance. In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy.

---

[70] State Rec., Vol. 15 of 17, Ruling on Post-Conviction Application of May 20, 2019, pp. 10-11.
[71] Franklin, 294 So.3d at 1048.

Rios-Delgado v. United States, 117 F.Supp.2d 581, 589 (W.D.Tex.2000); see also Burnett v. Collins, 982 F.2d 922, 930 (5th Cir.1993).  A decision not to move for a mistrial is similarly one of trial strategy.  Geiger v. Cain, 540 F.3d 303, 309 (5th Cir.2008) ("It is oft-recognized that the decision not to seek a mistrial is frequently a strategic one.").  The United States Fifth Circuit Court of Appeal has noted that counsel's "conscious and informed" strategic decision not to seek a mistrial "cannot be the basis for constitutionally ineffective assistance unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Ward v. Dretke, 420 F.3d 479, 491 (5th Cir.2005) (quoting Martinez v. Dretke, 404 F.3d 878, 885 (5th Cir.2005) (internal quotations omitted)).  In making that decision, counsel is "required to balance the harm caused by the [improper conduct] against the legitimate possibility that a new trial would present less propitious prospects for his client." Id.

La. Code Crim. P. art. 774 provide that "argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." Rebuttal argument "shall be confined to answering the argument of the defendant." Id.  Under Louisiana law, a prosecutor is afforded "considerable latitude" in making closing arguments. State v. Jefferson, 302 So. 3d 567, 578 (La. App. 4th Cir. 2020) (citations omitted).  "While the prosecution must base its conclusions and deductions in closing arguments upon evidence adduced at trial, both the State and defense are entitled to their own conclusions as to what is established by the evidence, and either may press upon the jury any view arising out of the evidence." Id. (citation omitted).  Even when an argument is determined to be improper, a verdict will not be overturned unless the appellate court is "thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict." State v. Lee, 364 So. 2d 1024, 1030 (La. 1978) (citations omitted).

Pursuant to La. Code Crim. P. art. 771, the trial court may grant a mistrial when the state makes a remarks that is irrelevant or immaterial and the remark might create prejudice against the defendant if the court is satisfied that an admonition would not assure the defendant a fair trial. A mistrial is a drastic remedy and warranted only when the defendant suffers substantial prejudice such that he was deprived for any reasonable expectation of a fair trial." State v. Wall, 209 So. 3d 962, 971 (La. App. 5th Cir. 2014) (citations omitted).

Franklin complains of various statements made by the prosecution in its closing and rebuttal arguments. He claims it was improper for the prosecution to associate him with Johnson when Johnson testified that Franklin was not one of the perpetrators of the crime. He further claims that there was no evidence that he expressed anger towards the victims about their drug sales or that he and Johnson openly discussed a plan to rob and shoot the victims. He also claims that the prosecution improperly used character evidence to support its case.

The prosecution's theory of the case, based on the testimony of witnesses and the evidence presented, was that Franklin and Johnson were in a "turf war" with the victims and shot them out of anger and in revenge for Harris selling drugs on their turf and under the guise that the product was from Franklin. The prosecutor's argument was a fair inference based upon the testimony and evidence presented and therefore was not improper.

Franklin himself admitted that he was at Smith and Walker's residence daily along with Johnson and Wilson.[72] He also admitted that he was a drug dealer and that he sold crack and heroin in the neighborhood.[73] He testified that he needed clientele to make money and that the

---

[72] State Rec., Vol. 12 of 17, trial transcript (con't) of November 3, 5-8, 2014, pp. 511-12.
[73] Id., at pp. 511, 540.

way to sell drugs was to have the best "product."[74]  Franklin testified that he knew that the victims were telling customers that they were getting their product from him.[75]

Perry testified regarding an altercation between Desmond Harris, Johnson, and Franklin relating to drug transactions during which Perry heard Johnson say he was going to kill Desmond.[76] Perry claimed that he heard yelling but that he did not see Franklin say anything, rather Franklin was "just looking."[77]  Perry spoke to Johnson and Franklin at some point after the incident and told them not to do anything, but they brushed him off.[78]

Walker testified about a separate altercation between Johnson, Franklin, Harris and her girlfriend after Franklin learned that the women were using his name for their sale of crack cocaine.[79]  Walker testified that the women were taking Franklin's clientele, and Walker agreed that Franklin was "not pleased."[80]  She testified that one of the victims accused Franklin of robbing their house, and that, while Franklin did not saying anything during the confrontation, she recalled that afterward Franklin and Johnson always watched the house.[81]  Walker testified that she was afraid of Franklin and that he was "mean" and "evil."[82]  She recalled an incident when he pointed a gun in her face and struck her across the face.[83]  She explained that "either you did what he said and you just shut up and sat where you sat at or something was going to happen to you,  Well at least that was the impression that he put off."[84]

---

[74] Id., at pp. 541, 543.
[75] Id., at p. 543.
[76] State Rec., Vol. 10 of 17, trial transcript of November 3, 5-8, 2014, pp. 102-106, 118.
[77] Id., at p. 103.
[78] Id., at pp. 106, 131.
[79] Id., at pp. 186-88.
[80] Id., at p. 188.
[81] Id., at p. 187.
[82] Id., at p. 205.
[83] Id.
[84] Id., at p. 206.

Both Perry and Walker witnessed Franklin in possession of an AK-47 on the evening of the shootings.[85]  Both of them recalled that Franklin and Johnson were wearing clothing items belonging to Perry and were dressed in all black.[86]  Perry specifically testified that Franklin made eye holes in a skull cap.[87]  Walker specifically recalled that when the two men left the house, Franklin was carrying the AK-47 and Johnson had the 380.[88]  She testified that she heard shots within five minutes after they left.[89]  Walker testified that she overheard Smith on the phone with Franklin afterwards and Franklin was questioning Smith about what she could see outside.[90]  Walker further testified that, after the shootings, Franklin's girlfriend, Maleen Dilbert, whom she had never met before, came to the house asking for a cup of sugar and that Arnold Wilson spoke to Franklin on the phone during that time.[91]  Perry admitted that he spoke to Franklin on the phone after the shootings and that Franklin told him to put on the news.[92]

Given the foregoing testimony, the prosecution's theory of the case and its statements in support of its theory were not inappropriate.  Defense counsel was not ineffective for failing to object to the statements complained of by Franklin or for failing to move for a mistrial.  United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); Wood v. Quarterman, 503 F.3d 408, 413 (5th Cir. 2007) (" '[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.' ")

---

[85] Id., at pp. 108-09, 111, 119, 184-86, 189-90..
[86] Id., at pp. 107-08, 111, 120, 190, 217.
[87] Id., at p. 111.
[88] Id., at pp. 190, 217.
[89] Id., at pp. 193, 195, 211-12.
[90] Id., at pp. 191-92.
[91] Id., at pp. 194-95.
[92] Id., at 133-35.

(quoting <u>Clark</u>, 19 F.3d at 966); <u>accord</u> <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.");<u>Smith v. Puckett</u>, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); <u>see also</u> <u>Koch v. Puckett</u>, 907 F.2d 524, 530 (5th Cir. 1990) ("Counsel is not required to make futile motions or objections.").

Franklin also claims that the prosecution in rebuttal vouched for the credibility of Walker and Perry and claimed that there was no influence upon them by law enforcement. "While a prosecutor may not give his personal opinion regarding the veracity of a witness, it is permissible for a prosecutor to draw inferences about a witness' truthfulness from matters on the record." <u>State v. Palmer</u>, 775 So. 3d 1231, 1236 (La. App. 1st Cir. 2000) (citations omitted).

Here, the prosecutor made statements in rebuttal about Perry and Walker's motive to lie, or lack thereof, in response to the defense's arguments regarding credibility, that Belisle was the only witness who did not have a motive to lie, and that law enforcement had intimidated Perry and Walker.[93]  In response to the defense's closing argument, the prosecution argued that Walker did not have a motive to lie.[94]  The prosecutor admitted that law enforcement had "roughed up" Perry when he attempted to go back to bed rather than speak to the police about the shootings.[95]  The prosecutor, however, argued that both Perry and Walker testified that, once they cooperated, they told the truth and were not told what to say.[96]  This argument is consistent with Perry's testimony

---

[93] State Rec., Vol. 13 of 17, voir dire and closing argument transcripts, November 3 and 8, 2014, pp. 243-47, 250-51, 253-58.
[94] <u>Id.</u>, at p. 272.
[95] <u>Id.</u>, at pp. 276-77.
[96] <u>Id.</u>, at p. 277.

that he voluntarily gave a statement to police after he realized that Franklin and Johnson may have tried to set him up and that he was concerned that his fingerprints and DNA might be on the AK-47 and black clothing,[97] as well as Walker's testimony that the detectives did not tell her what to say and that she gave the detectives a true and accurate statement.[98]  The prosecutor's comments about these witnesses' credibility was based on their testimony and not his personal opinion or information that had not been disclosed to the jury.  Thus, the prosecutor did not improperly vouch for the credibility of Walker and Perry.  Palmer, 775 So. 3d at 1236.

Franklin next claims that the prosecutor mischaracterized the distance between Franklin's residence and the location where the AK-47 bullets were found.  In his closing argument, defense counsel argued that the bag with the ammunition was found two houses over and out in the open.[99] In rebuttal, the prosecutor argued that the ammunition was not found two houses over, but rather Franklin lived in a double residence and that the ammunition was found under the house at 2359 North Villere in the backyard "six feet to the right from his house."[100]

Detective Bender testified that police searched the adjoining properties to Franklin's residence because perpetrators sometimes hide contraband nearby so they do not get caught with it in their possession.[101]  Bender testified that there was a house to the left of Franklin's residence that sat further back and that the two houses "had an open area in the back.  There was no fence between the properties and at the back of that residence by one of the pillars that holds up the house there was a purple and gray or purple and silver bag concealed by that pillar."[102]  He further testified that in the bag there were numerous rounds of ammunition consistent for use in an AK-

---

[97] State Rec., Vol. 10 of 17, trial transcript of November 3, 5-8, 2014, pp. 127-32.
[98] Id., at pp. 197, 204.
[99] State Rec., Vol. 13 of 17, voir dire and closing argument transcripts, November 3 and 8, 2014, p. 252.
[100] Id., at p. 281.
[101] State Rec., Vol. 11 of 17, trial transcript (con't) of November 3, 5-8, 2014, p. 274.
[102] Id.

47 type assault rifle.[103]  He testified that the house was "next" to Franklin's house.[104]  Bender identified pictures of the residences, shared yard, and the surrounding area.[105]

Bender did not testify as to the address for the particular residence where the ammunition was found.  It, however, appears from his testimony that the ammunition was not found at the residence attached to the double in which Franklin lived.  Rather, it appears there is a third, separate residence sharing the same property as the double residence and that the ammunition was found outside of that residence.

Franklin, however, has not shown that the prosecutor's misstatement was deliberate.  Nor has he shown that this erroneous remark influenced the jury to the extent that the statements contributed to the verdict.  The evidence of Franklin's guilt was strong.  Moreover, the trial judge clearly and repeatedly instructed the jury that the arguments were not to be considered as evidence in the case.[106]  There is no basis for concluding that the jurors disregarded those instructions. Franklin simply cannot show that there is a reasonable probability that if counsel had only objected to the comment and moved for a mistrial, the result of the proceeding would have been different.

Franklin's final claim is that his counsel was ineffective for failing to object and move for a mistrial when the prosecution argued that he had personally examined the shell casings from the scene of the murders and found that they matched the ammunition found at Walker and Smith's residence and some of the ammunition found near Franklin's residence.

In rebuttal, the prosecutor argued as follows:

> I took your lead when you all asked for the magnifying glass but I didn't
> have the opportunity because all of the evidence is locked up.  But once we went
> and got one I took the liberty to determine whether or not the shell casings found at

---

[103] Id.
[104] Id., at 275.
[105] Id., at pp. 268, 275-76.
[106] State Rec., Vol. 12 of 17, trial transcript (con't) of November 3, 5-8, 2014, pp. 567-68; State Rec., Vol. 13 of 17, voir dire and closing argument transcript of November 3 and 8, 2014, pp. 267, 270-71.

the murder scene was the exact same type that was at Brittany and Crystal's house that the police recovered. When I looked at it is says 380 auto and it has a little logo on top of it. It has like a crown and then some vertical lines and then another crown. Then I look at one of the same unspent bullets and it is the same logo, same writing. It is a perfect match. The ammunition found at Brittany and Crystal's house was the same exact shell casings found at the crime scene. Which corroborates the fact that Crystal and Johnny Perry say Tiger and Red leave with a 380 that had been left at that house. Red tells you he kills them with a 380 that he took from Brittany and Crystal's house and the bullets he left behind match the bullets left at the crime scene. Perfect match.

So I take it a step further using my trusty magnifying glass. I saw that the bullets recovered –and it wasn't two houses away from Charles Franklin's. Let's get this straight, ladies and gentlemen. We are talking doubles. We are not talking two whole households over. We are talking about the back yard is six feet to the right from his house. Let's get that straight. They mischaracterized that.

Then I look at all the AK shells that were left at the scene. I am going to just pull out one that Weishan pulled out. I see that it is kind of a darker color. So I look inside the Winchester box and I see the Winchester box and I see the Winchester box with shiny, shiny. And I see we got two different colors and two different sizes. So obviously just on the face the shell casing left isn't a Winchester. So then I say what else they recover? Well they have this three or four box of Monarch ammunition. All that dark greenish color with gold copper and I compare it. I look on its face, same color. Wow, same color. So I pull out the trusty magnifying glass. Let's check for the marking son the bottom. So I see on the bottom it says 7.62 x 39. At the top there is some sort of logo. I am not sure what it is. There is some sort of print design. I am assuming it is the manufacturers design. So I take one of the ones that was recovered. It is 7.62 x. 39 and a logo. The exact same logo on that one.

Now I have been able to conclude it but I am not a juror. I am able to conclude that this gun casing is a Monarch. The same make. The three boxes that were found right under the house connected to Charles Franklin's house. A perfect match. The 380 that Red used that Brittany and Johnny Perry said he left the house with. That he stored at that house. That the bullets left behind perfectly match to the spent casing at the scene. And the bullets found under Charles Franklin's house, a perfect match to the AK-47 shells that were at the crime scene. Perfect match. Coincidence? Use your reason and your common sense.[107]

Initially, Franklin has not shown that this portion of the prosecution's argument was

objectionable or that an objection would have been sustained. The prosecutor argued his

---

[107] State Rec., Vol. 13 of 17, voir dire and closing argument transcript of November 3 and 8, 2014, pp. 280-82.

interpretation of the evidence presented and the conclusions the jury could necessarily draw from the evidence. The jury heard testimony from multiple witnesses relating to the ammunition found at the scene of the shootings as well as at Smith and Walker's residence and on the shared property next to Franklin's residence. Deputy Weishan identified 7.62x39 spent shell casings and spent bullets found in the first and second bedroom of victims' residence.[108] Detective Bender identified a 380 caliber spent casing in the yard near Desmond Harris' body.[109] He also identified two 380 caliber live bullets in a box that was found by Walker at her residence.[110] Bender further identified 7.62x39 caliber assault rifle ammunition found inside victims' house.[111] He identified the 7.62x39 ammunition found in a bag outside of a residence just behind Franklin's residence.[112] Significantly, Bender identified a complete box of Winchester brand ammunition as well as numerous rounds of Monarch brand ammunition with markings on them that were found in the bag.[113] Bender explained that the Winchester brand ammunition was solid brass whereas the Monarch ammunition had a different color casing and he held up one bullet of each brand so that the jury could see the difference.[114]

Sergeant Winbush, an expert in the field of firearm examination, testified regarding his examination of 7.62x39 spent casings, spent bullets and a full bullet from the crime.[115] He testified that the 7.62x39 bullets extracted from the autopsy of Kawanda Harris were shot from an AK-47 firearm.[116] Winbush identified a 380 cartridge case found at the crime scene.[117] He noted that the

---

[108] State Rec., Vol. 10 of 17, trial transcript of November 3, 5-8, 2014, pp. 77-79.
[109] State Rec., Vol. 11 of 17, trial transcript of November 3, 5-8, 2014 (con't), pp. 260, 263-64.
[110] Id., at pp. 258-59.
[111] Id., at pp. 319, 322.
[112] Id., at pp. 274-77.
[113] Id., at p. 321.
[114] Id.
[115] Id., at pp. 356-57.
[116] Id., at pp. 359, 360, 361.
[117] Id., at pp.357-58.

manufacturer imprints the bullet caliber on the bottom of the cartridge case.[118]  He also identified

the 380 bullets from the autopsy of Desmond Harris.[119]

Given the testimony of the witnesses and the evidence presented, and the jurors' ability to

review that evidence and compare the bullets for themselves, which they apparently did given that

they asked for a microscope, the prosecutor's comments were not improper.  Nonetheless, even if

the prosecution's argument about the bullets was erroneous, Franklin has not shown that the

outcome of his trial would have been different had his counsel objected and requested a mistrial.

The evidence of Franklin's guilt was overwhelming.  Further, on a number of occasions, the trial

court instructed the jury that the arguments were not to be considered as evidence in the case.

Again, there is no basis for concluding that the jurors disregarded those instructions.

In summary, Franklin has not shown that there is a reasonable probability that if counsel

had only objected to the prosecution's arguments and moved for a mistrial, the result of the

proceeding would have been different.  He is not entitled to relief as to this claim.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed

by Charles Franklin be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14) days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from

---

[118] Id., at p. 358.
[119] Id., at p. 359.

a failure to object.  28 U.S.C. § 636(b)(1); <u>see</u> <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d

1415, 1430 (5th Cir. 1996) (en banc).

     New Orleans, Louisiana, this __3rd__ day of January, 2022.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**